UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 02-21050-CIV- Ungaro-Benages

FEDERAL TRADE COMMISSION,

    Plaintiff,

vs.

CAPITAL CHOICE CONSUMER
CREDIT, INC., a corporation, also
doing business as NATIONAL CREDIT
SHOPPER, also doing business as NCS, et al.

    Defendants.

_____/



## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for consideration of the Court upon Plaintiff Federal Trade Commission's Motion for an Order to Show Cause Why a Preliminary Injunction Should Not Issue Against Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corp., Hartford Auto Club, Inc., Ricardo E. Martinez, Johnnie Smith and Wilfredo Lugo, dated September 13, 2002. The Court conducted an evidentiary hearing on Tuesday, October 15 and Wednesday, October 16, 2002. The Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

### I
### Jurisdiction and Venue

This cause of action allegedly arises under 15 U.S.C. §§ 45, 53, 57 and §§



6101-6108. The Court therefore has subject matter jurisdiction. Venue is appropriate because Defendants' Capital Choice Consumer Credit, Inc. ("Capital Choice"), Millennium Communications and Fulfillment, Inc. ("Millennium") and Hartford Auto Club, Inc.'s ("Hartford") principal places of business are in the Southern District of Florida. Mr. Ricardo Martinez, an individual Defendant and principal of corporate Defendants Capital Choice, Millennium and Hartford, also resides in the Southern District of Florida, as do the Defendants Johnnie Smith and Wilfredo Lugo.

## II
## Stipulations

The parties to the present motion made several stipulations at the beginning of the evidentiary hearing, which are more fully set out in the transcript of the evidentiary hearing.

## III
## Background Facts

On April 8, 2002, Plaintiff Federal Trade Commission ("FTC") filed its Complaint for Injunctive and Other Equitable Relief and its Application for *Ex Parte* Temporary Restraining Order ("TRO") with Asset Freeze and Accounting, and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

On April 9, 2002, the Court issued the *Ex Parte* TRO with asset freezes and expedited discovery and appointed Judith Korchin, Esq., as Temporary Receiver for the corporate defendants.

On April 22, 2002, plaintiff FTC amended its Complaint to add Ecommex Corporation as a defendant and as a receivership defendant.

2

On April 19 and 22-23, 2002, a Preliminary Injunction Hearing was held, after which plaintiff and defendants stipulated to a Consent Order *Pendente Lite* ("Consent Order").

On August 8, 2002, with leave of the Court, plaintiff FTC filed its Second Amended Complaint adding four additional defendants—Zentel Enterprises, Inc., Hartford Auto Club, Inc., Johnnie Smith and Wilfredo Lugo. Plaintiff's Second Amended Complaint contains five additional counts. Four of these counts relate to defendants' alleged practice of debiting of consumers' bank accounts without their authorization in violation of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the Telemarketing Sales Rule, 16 C.F.R. Part 310.

On September 3, 2002, defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corp., Hartford Auto Club, Inc., Ricardo E. Martinez and Wilfredo Lugo filed their Answer to the Second Amended Complaint.

On September 23, 2002, plaintiff filed its Motion for Order to Show Cause Why a Preliminary Injunction Should Not Issue Against Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corporation, Hartford Auto Club, Inc., Ricardo E. Martinez, Johnnie Smith and Wilfredo Lugo prohibiting these defendants from further violations of Section 5 of the FTC Act, 15 U.S.C. § 45, and the Telemarketing Sales Rule, 16 C.F.R. Part 310, as alleged in Counts II, III, VI, and VII of the Second Amended Complaint.

On October 15 and 16, 2002, a hearing on plaintiff's motion for a preliminary injunction was held in front of the undersigned Magistrate Judge at which the parties

3

consented to having this Court rule on the merits of plaintiff's motion for a preliminary injunction.

## IV
## The Parties

Plaintiff Federal Trade Commission is an independent agency of the United States Government, created by statute. (15 U.S.C. §§ 41-58, as amended). The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing practices. The Commission may initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act and the Telemarketing Sales Rule to secure such equitable relief as may be appropriate in each case, including restitution for injured consumers. (15 U.S.C. §§ 53(b), 57b and 6105(b)).

Defendant Capital Choice Consumer Credit, Inc. ("Capital Choice"), is a Florida corporation with its offices and principal place of business located at 9590 NW 25th Street, Miami, Florida. Capital Choice also does business as National Credit Shopper and NCS. Capital Choice transacts business in the Southern District of Florida. (Second Amended Complaint ¶ 5; Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corp., Hartford Auto Club, Inc., Ricardo E. Martinez and Wilfredo Lugo's Answer to Second Amended Complaint ("Defendants' Answer") at 2).

Defendant Millennium Communications and Fulfillment, Inc. ("Millennium")

is a Florida corporation with its principal office and place of business at 9590 NW 25th Street, Miami, Florida.  Millennium transacts business in the Southern District of Florida. (Second Amended Complaint ¶ 5; Defendants' Answer at 2).

Defendant Ecommex Corporation ("Ecommex") is a Florida corporation with its office and  principal place of business at 9590 NW 25th St., Miami, Florida. Ecommex transacts business in the Southern District of Florida.  Ecommex was formerly known as Millennium Express Group, Inc.  (Second Amended Complaint ¶ 9; Defendants' Answer at 2).

Defendant Hartford Auto Club, Inc. ("Hartford") is a Florida corporation. Hartford transacts business in the Southern District of Florida.  (Second Amended Complaint ¶ 10; Defendants' Answer at 2).

Defendant Ricardo E. Martinez is an owner, officer and director of defendants Capital Choice, Millennium, Ecommex and Hartford.  Martinez transacts business in the Southern District of Florida.  (Second Amended Complaint ¶ 11; Defendants' Answer at 2-3).

Defendant Johnnie Smith is the Chief Executive Officer of defendant Millennium.  (Record of Preliminary Injunction Hearing, October 15-16, 2002 ("R.") at 201).  Defendant Smith transacts business in the Southern District of Florida.

Defendant Wilfredo Lugo is the general manager of defendant Millennium. He is responsible for customer service, compliance, and defendant Millennium's call center operations.  (R. at 298).  Defendant Lugo transacts business in the Southern District of Florida.

Millennium, Capital Choice and Ecommex operate their business from the same

5

address, utilizing the same computer system and the same employees, including the same officers, bookkeeper and accountant. They each participate or have participated substantially in the businesses at issue in the Complaint. (Agreed Emergency Motion for and Order Directing Ocean Bank to Lift the Freeze on Accounts of Non-Party Ecommex Corp. ¶ 4).

Defendants currently market the Hartford Auto Club and the Premium Mega Saver and Minute Mega Saver as upsales (R. at 201, 202). Previously the Hartford Auto Club and Minute Mega Saver were sold as upsales to defendants' credit card sales (PX 3; R. at 202, 203). Following entry of the Consent Order *Pendente Lite* on April 23, 2002, defendants ceased selling the credit cards, but continued to sell the Hartford Auto Club, Premium Mega Saver and Minute Mega Saver as upsales to other products (R. at 202-204). While these upsale programs were sold in conjunction with other products, each constitutes a separate product which was separately debited from consumers' bank accounts (e.g., PX 66, Attachment B). Plaintiff's original Complaint and Amended Complaint contained no allegations regarding the Hartford Auto Club, the Premium Mega Saver or the Minute Mega Saver, nor did the original Complaint or Amended Complaint contain allegations of unauthorized debiting. Therefore, none of these products were the subject of the Consent Order *Pendente Lite.*

The Consent Order specifically permitted the Defendants to continue their other businesses – the Hartford Auto Club and long-distance products – Premium Mega Saver and 1000-Minute Mega Saver (the "phone card program") – with the proviso that such businesses be operated in accordance with the law. (Dkt. No. 43, ¶ 13).

Essentially, the Second Amended Complaint alleges that Defendants were

debiting consumers' accounts for these other products without authorization, as required by the F.T.C. Telemarketing Sales Rule, 16 C.F.R. §310.3-310.4. In addition, the Plaintiff alleges that because these programs were previously sold as an "up-sale" to the credit card program, some consumers had been misled into believing they could pay for the up-sold programs with their "account of record," which they thought meant the catalog credit card, in violation of 15 U.S.C. §45(a).

**V**
**The Alleged Violations**

The new allegations of the Second Amended Complaint pertain to what are known as "up-sales" of two specific products which are offered by the Defendants, the Hartford Auto Club program and the phone card program. The F.T.C. seeks to enjoin certain alleged practices regarding the sale of these two programs. It is to be noted that the F.T.C. does not allege that either of these programs are not what they are represented to be. In fact, the F.T.C., in its Memorandum in Support of its Motion for Preliminary Injunction, etc., asserts that not one consumer has complained about the phone card program itself and the evidence further suggests that there have been no complaints about the Hartford Auto Club program. It is the method by which these programs are sold that is alleged to be violative of the act.

The Second Amended Complaint states the allegations regarding the Hartford Auto Club and the phone card program as follows:

> ¶34. In numerous instances, Defendants caused consumers' checking accounts to be debited for defendants' Capital Up-Sale Programs [Hartford Auto Club and phone card program] without having previously obtained the consumer's authorization for such

debit....

\*\*\*

¶51. In numerous instances, in connection with the telemarketing of the Hartford Auto Club, 1000-Minute Mega Saver, Premium Mega Saver, and other up-sale programs, defendants have debited consumers' checking accounts without express authorization.

\*\*\*

¶53. In numerous instances, in connection with the telemarketing of Defendants' up-sale programs, such as the Hartford Auto Club, 1000-Minute Mega Saver, and Premium Mega Saver, defendants have failed to promptly and in a clear and conspicuous manner to the person receiving the call [sic] the following information: 1) The identity of the seller; 2) that the purpose of the call is to sell goods or services; and 3) the nature of the goods or services.

At this juncture the Court notes, and will discuss further below, that Plaintiff alleges that there was no express authorization received from the consumer for debiting the bank account, not that there was no authorization from the person whose account was ultimately debited. These are not necessarily the same person. This fact will become important for two reasons, (1) at the hearing on the motion for preliminary injunction, the F.T.C. contended that even if "the consumer" whose name was enrolled in the up-sale program had given authorization for a bank account to be debited, the F.T.C. act was violated unless that person was authorized to sign upon the bank account, and (2) the evidence at trial indicated that in at least three instances "the consumer" who was enrolled in the up-sale program and who authorized the debit was a family member or friend of the authorized signatory upon the bank account which

8

was debited.

Thus, there is a variation between the allegations of the Complaint, which are that "the consumer" has to have given permission for the debit and the position of the F.T.C. at the hearing that regardless of who that "consumer" was, the debit authorization had to come from the person(s) who owned the bank account.

The Complaint alleges that unauthorized debits happened in "numerous instances." It is undisputed, and the F.T.C.'s own evidence offered in support of the motion for preliminary injunction shows, that there are at least thousands of consumer enrollments in the Hartford Auto Club and phone card programs each year. If "numerous instances" has meaning in this case, it must be in the context of "numerous instances" of unauthorized debits out of those multitudes of transactions. In that context, the Court next discusses the evidence presented by the Plaintiff to support the claims made in the Second Amended Complaint.

The Plaintiff contended and offered to prove that as a routine business practice, the Defendants made unauthorized debits to consumers' bank accounts. Plaintiff has failed to sustain its burden of showing a <u>substantial</u> likelihood of success.


## VI

### The Plaintiff's Evidence

#### A. The Witnesses

As proof of its allegation that the Defendants routinely make unauthorized debits, the Plaintiff offered into evidence the declarations of 19 individuals. The Defendants point out that only 6 of these individuals actually received their up-sale

calls for the Hartford Auto Club and phone card program from employees of the Defendants. The remaining 13 were contacted by other distributors, unrelated to the Defendants, who have their own "core product" which they initially sell, and then, through contractual arrangements with the Defendants, are allowed to market the Hartford Auto Club or the phone card programs as an up-sale from their own core product. This is important because those other distributors, referred to as "other sellers" by the F.T.C. in its Brief in Support of its Motion for an Order to Show Cause Why Preliminary Injunction Should Not Issue, etc., are not parties to this motion for preliminary injunction. Thus, the F.T.C.'s case against the present Defendants to this motion must be judged solely upon the evidence presented as to these Defendants' alleged unauthorized debits.

This point is equally important because the Plaintiff alludes to a "script" that apparently was used by the other sellers in marketing the Hartford Auto Club and the phone card programs, and while the Plaintiff alleges that the other sellers do not adhere to the script, it fails to establish that the Defendants' own employees do not.

The six people who filed declarations relating to the Defendants' debiting practices are Ms. Cox (Pl.'s Ex. 63), Ms. Fox (Pl.'s Ex. 66), Ms. Hegna (Pl.'s Ex. 68), Ms. Hendricks (Pl.'s Ex. 69), Ms. Wagar (Pl.'s Ex. 78), and Ms. Hayes (Pl.'s Ex. 81). Each of these individuals, or a family member, received his or her up-sale enrollment in the Hartford Auto Club or the phone card programs after having initially signed up for the Capital Choice Consumer merchandise credit card, which was the core product of these Defendants, and which is no longer being offered. All but one of these up-sales was made before the date of the Consent Order. (Hayes, Pl.'s Ex. 81.) The

10

Plaintiff presents no evidence of any unauthorized debiting by the present Defendants after the cessation of the credit card program.

Nevertheless, the Court will consider these declarations to determine whether or not (1) there were, in fact, unauthorized debits made to the bank accounts of these individuals and, (2) if there were, whether six affected consumers would suffice to prove unlawful, routine business practices in the context of hundreds of thousands of enrollments?

Two of the six people who filed declarations regarding unauthorized debiting by these Defendants testified at trial. The Court concludes it must review the weight to be given to their testimony and its probative value as representative of the entire group of consumers who allegedly had unauthorized debits made to their bank accounts, as this is what the F.T.C. intended to prove through this testimony.

The Plaintiff's first witness was Ms. Mallion. Her contact was <u>not</u> with employees of these Defendants. She bought the core product (a credit card) from a company called Capital First Benefits. That "other" seller is not a party to the present preliminary injunction motion. It is neither alleged nor suggested that the present Defendants had any responsibility for the sale of the Capital First Benefits credit card.

The relevant portions of Ms. Mallion's testimony concern whether, at a later date, she agreed to enroll in the Hartford Auto Club or the phone card programs for a free trial, and agreed that her bank account would be debited if she did not cancel at the end of the free trial period.

Mrs. Mallion is a paralegal employed by a law firm which specializes in nursing home litigation; she has been in that profession for 17 years (Tr. October 15, 2002, p.

54). She received a telephone call from another seller offering a credit card, and subsequently received written material and responded by telephone to an automated service, to which she provided the necessary information to receive the credit card. Id. at 56. She testified that in that call to Capital First Benefits, "My phone call was disconnected. No one else came on the line and explained anything else, so I was disconnected at that point." ... "I was trying to get a phone number so I could call back and tell them that I was disconnected and I didn't get the remaining information." Id. at 58.

Sometime thereafter, Ms. Mallon noted that her bank account had been debited and she telephoned the other distributor, Capital First Benefits, to inquire about the debits. She spoke with the representative and, as a result of the conversation, she essentially "got nowhere." Id. at 59-60. With no further contact with anyone at Capital First Benefits, according to Ms. Mallion, three weeks later her account was debited $54.90 for enrollment in a phone card program. Id. at 64. Later, she filed an affidavit with her bank stating that she did not authorize the debit and the money was returned to her. Id. at 69. Sometime after that, her account was debited in the amount of $99.00 for membership in the Hartford Auto Club. Id. at 70. She followed the same procedure with her bank and again the money was refunded to her. Id. at 74. Ms. Mallion testified that she never gave out any information other than in that one, interrupted, telephone call during which she provided answers to questions asked by an automated program. Id. at 78.

Cross-examination, however, cast a somewhat different light upon Ms. Mallion's recollection. She first testified that she had never heard of the names of

either Hartford Auto Club or Premium Mega Saver "in any fashion or form" before she was debited. Id. at 86. The witness testified that she clearly remembered that the one and only call that she received from a salesperson on behalf of Capital First Benefits attempting to interest her in their credit card was on May 17. Id. at 54.

On cross-examination, Ms. Mallion was asked whether or not she recalled the words spoken on a tape-recorded telephone call, which were read to her by defense counsel. She testified that she did recall at least a portion of that tape-recorded call, "I already testified that I gave my bank account information to an automated phone call, which is that conversation." The witness was then asked whether or not, if the tape recording were played in the courtroom, it would still be her testimony under oath that she had not heard, and responded affirmatively to, the offer for the free trial of the Hartford Auto Club and the phone card program. Her answer to that question was equivocal: "I don't think so. I have to hear it. I cannot tell unless I heard whether it was my voice. I don't remember ever saying okay to that. I wouldn't have done that. ... I have no recollection of hearing about Hartford Auto Club. I honestly do not believe that I heard that portion of their automated telephone thing." Id. at 91-92. Thereafter, defense counsel requested that Ms. Mallion be asked to appear in court the next day so that she could listen to and identify her voice on the tape recording. She did not appear in court the next day, however.

On the defense case in chief Mr. Wilfredo Lugo, the general manager of the Defendant Millennium Communications and Fulfillment, Inc., testified that he obtained the tape recording of Ms. Mallion's conversation from the distributor, Capital First Benefits, who had dealt with Ms. Mallion, and that he had personally listened to

13

the tape. He had also had it transcribed. Mr. Lugo said that the tape did not cut off at any point, that it was complete, and that Ms. Mallion clearly agreed to be enrolled in the Hartford Auto Club and phone card programs. Mr. Lugo further stated that he had the tape recording present in the courtroom and had, with the Court's permission, brought audio equipment into the courtroom such that the tape could be played aloud, in the event his testimony was challenged. (Tr., October 16, 2002, pgs. 303-304.) The F.T.C. offered no rebuttal or challenge to the Lugo testimony.

Plaintiff's next witness was Ms. Fox. Her job, for 14 years, has been as the lead person in a consumer call center for the Nintendo Corporation. (Tr. October 15, 2002, pgs. 97-98.) Her 21-year-old son, Tony, received in the mail the offer of the Capital Choice merchandise credit card. As he apparently did not have a bank account, Ms. Fox wrote out a check for him to accept the credit card offer, in the amount of $39.00. (Id. at 102-103.)   She testified that sometime thereafter, a debit was made to her account and that the bank informed her that "this had come through under my son's name. And my son is not on my account." (Id. at 106.) She filed a form with her bank stating that she had not authorized the debit and her money was refunded. (Id.)  A month thereafter, her account was debited $99.00 for the annual fee for participation in the Hartford Auto Club. The bank told her that the "transaction was made under my son's name again." (Id. at 108.) She again filed a form with her bank and the money was refunded a couple of weeks later. (Id. at 109.)   She testified that she asked her son whether he had authorized the membership in the Hartford Auto Club and the phone card program for himself, but, "He had no idea. He had nothing to say. He's never spoken to them at all on the phone." (Id. at 112.)

14

On cross-examination, however, Ms. Fox allowed that if her son, Tony, had later authorized enrollment in the Hartford Auto Club and the phone card program, it would have been because he was "misled" into agreeing. Ms. Fox said she would be available the next day to listen to the tape recording; however, the following morning the F.T.C. informed defense counsel that neither Ms. Fox nor Ms. Mallion would be appearing in Court. (Tr., p. 187.)

The Court notes, from the text of the transcript of the Mallion tape recording, that the automated response asks the caller, "Are you the authorized signer on this account?" after having the multi-digit number of the bank account stated by the consumer. (Mallion testimony at 89.) On the defense case, Mr. Lugo testified that he had also listened to the tape recording of Tony Fox in which he authorized the enrollment in his name for the Hartford Auto Club and the phone card program. Mr. Lugo had the tape and audio equipment present in the courtroom prepared to be played if that statement was challenged by the Plaintiff. (Tr. October 16, 2002, pgs. 304-305.) It was not challenged.

The Court is not persuaded by this testimony that there was an unauthorized debit made. The most that can be said is that Ms. Fox did not participate in any phone call in which her son may, or may not, have authorized participation in the two programs and represented that he was a signatory to the bank account which the Defendants had on record through Ms. Fox's use of her account to pay for her son to receive the merchandise credit card. The Plaintiff did not attempt to prove that the Defendants should have known that the 21-year-old son had no authority to accept the Hartford Auto Club and the phone card program registered in his name by using the

15

checking account number in the Defendants' records. This falls short of proving that the Defendants, as a routine business practice, day in and day out, knowingly make unauthorized debits to consumers' accounts. The "consumer" in this instance was Tony Fox, not his mother, and the Plaintiff makes no showing that the Defendants knew or should have known that he was without authority to enroll himself and use his mother's bank account information.

The Plaintiff's next witness was Ms. Hegna. She also was not the "consumer" in the transaction complained of by the Plaintiff; rather, her 19-year-old daughter was the consumer. Her daughter, Kayla, did not have a checking account so she gave her mother $43.00 in cash and, "I, in turn, wrote a check out to Capital Consumer Credit. ... I wrote the check out for her.... I looked over the application that she had filled out ...It was filled out in Kayla's name." (Id. at 141.) As to the initial $43.00, Ms. Hegna stated that she "had knowledge of it and I knew that I expected it to be debited on my account." (Id. at 143.) Six weeks later, when the annual membership fee for the Hartford Auto Club was debited from her account she was "very puzzled, why there was a $99.00 deduction." (Id. at 145-146.) She then had several conversations with Hartford Auto Club, which was having difficulty finding the account either in her name or in her daughter's name. Thereafter, at the advice of representatives of Hartford, she went to her bank and told them to put the money back into her account, which they did. (Id. at 146-151.) The declaration filed by Ms. Hegna (Pl.'s Ex. 68) states that "I explained to the bank that I never purchased anything from [Hartford Auto Club] and certainly did not authorize them to debit my account." (¶7)

On cross-examination, Ms. Hegna initially denied any knowledge of whether

or not her daughter had authorized the Hartford Auto Club enrollment. (<u>Id.</u> at 155.)

She further stated that Kayla "told me she did not" enroll herself in the Hartford

program. (<u>Id.</u> at 156.) Defense counsel then read to Ms. Hegna from the transcript of

a tape recorded telephone conversation between Kayla and a sales representative for

the Hartford Auto Club. (Id. 156-157.) The witness was then asked,

> Q. Will you be here tomorrow to listen to a tape recording and identify Ms. Kayla's voice for you [sic]?
>
> A. Yes... .

(<u>Id.</u> at 159.)

After that question, Ms. Hegna immediately recanted her former testimony. She

acknowledged that Kayla had enrolled herself in the Hartford Auto Club and that she

knew it. She explained that Kayla was "naive" and did not realize that the annual fee

would be debited from her mother's checking account. She stated that "I never

authorized them to take anything out of my account," but she knew that her daughter

had. This colloquy followed,

> Q. Remember it was going in [Kayla's] name. She's the one that authorized to take the Hartford Auto Club. You <u>know she did</u>. You know she did it without [Ms. Hegna even] listening [to the tape]? You know she said okay to the Hartford Auto Club program?
>
> A. I'm pretty certain - -
>
>                                  ***
>
> Q. She <u>did, didn't she</u>?

A. I'm pretty certain she did, and she won't deny it, and I won't.

***

A. She didn't realize that she had to cancel it. That's what I'm saying.

Q. You all talked about it quite a bit, about what she understood and what she didn't understand?

A. Yes.

Q. Incidentally, that was about March 25th that she said okay and ordered Hartford. Nobody debited you all until long after the free trial. In fact, your debit was on May the 1st?

A. That's correct.

(Id. at 160-161.)

The scenarios presented by Ms. Fox and Ms. Hegna are similar. Ms. Fox denied that Tony had enrolled himself in either of the up-sale programs until she learned that there was a tape-recorded conversation, at which time she stated that perhaps he "was misled" in the conversation. Knowing that she was expected to appear in court the next morning to identify her son's voice on the tape recording she declined to do so. Ms. Hegna initially denied that Kayla had enrolled herself in the Hartford Auto Club program until she realized that there was a tape recording, and then immediately admitted that not only had Kayla authorized the Hartford Auto Club enrollment, but that Ms. Hegna had known it all along.

In each instance, the mother willingly paid for the enrollment in the merchandise catalogue credit card in the name of the adult child. The Plaintiff offers

18

no evidence to show that the Defendants would have or should have known that the adult son or daughter who was the "consumer" was not authorized to use the same bank account to debit the annual fees for the up-sale programs after the free trial period had expired. The debiting was not done with lightning rapidity to snatch money from the consumer's bank account at the earliest possible time. Weeks or even months went by before the debit took place, apparently even well after the expiration of the initial free trial period.

With this testimony the Plaintiff has not carried the heavy burden of proving that the Defendants intentionally, as a routine practice, violate the F.T.C. act by making unauthorized debits of consumer accounts. The Court did make the factual finding at the hearing that the Defendants had debited bank accounts, in these two instances, without the separate express permission of the person who owned the account. The Court did not say, however, that this was proof of intentional conduct, much less of a routine practice.

The Court will next discuss the declarations of the other persons who actually received their up-sale contact from employees of the Defendants, as a result of their purchase of the core product, the Capital Choice consumer merchandise card. Because these declarants were not present in court, they were not subject to cross examination. The importance of that fact is heightened in this case, in that of the three witnesses who did testify in court, each modified her testimony upon learning that the relevant conversations were tape-recorded, and two declined to return to court to be confronted by the tape recordings.

Ms. Cox is the declarant in Pl.'s Ex. 63. On November 17, 2001, she wrote a

19

check to be enrolled in the Capital Choice Consumer credit card program. On December 5, she received a call from a woman named Laura at Capital Choice, who explained that they had received the $43.00 check and were going to offer her free trial memberships from "a phone company and a towing service." In mid-December, she received the written information on the Hartford Auto Club and on the phone card program: "But I didn't pay any attention to the letters and put them away. I wasn't interested in these services."

A month later, in mid-January of 2002, she learned that $39.00 had been debited from her checking account for the annual fee for the phone card. Only then did she read "through my old mail and read the letter" from the phone card company, which stated that $39.00 would be automatically debited to her account after the free trial membership. She was angry about the debit and when she placed a call, the service representative told her that she had authorized the debit after the free trial membership in her conversation with Laura from Capital Choice. She states that is "absolutely untrue." Then she read the information she had received from Hartford Auto Club, which also stated that at the end of the free trial membership, if she did not cancel, her account would be debited for the annual membership fee.

The $99.00 annual fee for the Hartford Auto Club was not debited from her account until February 4th, 2002, some 7 weeks after she had received, but did not read, the literature from the two up-sale programs. Ms. Cox further declares, at ¶18, that her bank had paid a check in the amount of $78.56, which was drawn on insufficient funds. Therefore, she was charged an additional $20.00 by the bank. The reason for this inclusion is not clear. She does not suggest that this payment had

anything to do with the Defendants and, in fact, examining Ex. "G" to her declaration, it appears that was just a check which she had written to someone else and which had bounced.

This testimony, at best for the Plaintiff, indicates that the consumer may have agreed to the free trial of the Hartford Auto Club and the phone card programs, received the appropriate information in the mail describing the terms and informing her that her account would be debited if she did not cancel at the end of the free trial period. Of her own volition, she chose not to read the terms of the very information which she had requested and many weeks later her accounts were debited. This testimony falls short of proving a routine practice of unauthorized debiting, and fails to show that the Defendants had any reason to believe that in this instance, out of hundreds of thousands of debiting transactions, the consumer did not realize that she would be debited. As to the declaration of Ms. Cox that she definitely was not told in the telephone conversation with Laura of Capital Choice that if she accepted the free trial offer, and did not cancel, her account would later be debited for annual membership, this testimony is similar to the live witnesses whose testimony changed during cross-examination when learning that the conversation was tape-recorded and was available to be played in the courtroom.

The affidavit of Ms. Hendricks is Plaintiff's Ex. 69. She enrolled in the Capital Choice merchandise catalogue credit card program in February, 2002. She offers no testimony as to whether or not she received a subsequent telephone call offering her membership in the Hartford Auto Club or the phone card program. However, she apparently did, because "in late March, 2002, I received a letter from Hartford Auto

Club." (Id. at ¶5.)   Thereafter, she called Hartford Auto Club to cancel that membership. The cancellation was effected; she was never debited the $99.00 annual Hartford membership fee. In April her bank account was debited $39.00, through the check which she had written to Capital Choice for her credit card membership. It appears she was debited automatically one time for $39.00 and was debited another time for the same $39.00 when her original check was deposited. She called the telephone number for the phone card program and told the woman who answered that she wanted to cancel her account and not have any payments withdrawn. The phone representative "cancelled the account and gave me cancellation #PC7777." Her bank then credited $78.00 to her account, which is twice the amount that she was debited for the phone card program, thus she was reimbursed both for her credit card program fee and for the phone card annual fee.

The Court must consider whether this declaration proves the Plaintiff's claim that the Defendants, as a routine business practice, engage in unauthorized debits. It does not. Ms. Hendricks received the standard written information from Hartford Auto Club. When she called to cancel that membership, it was cancelled, she was given a cancellation number, and no debit was ever made from her account for the $99.00 annual fee.

The declaration of Ms. Wagar is Pl.'s Ex. 78. She wanted to receive the Capital Choice core product, the catalogue merchandise credit card. She did not have a bank account, but a friend of hers agreed that he would write the $39.00 check on her behalf. She sent the check to Capital Choice. Some time thereafter, on an unspecified date, she received the call offering her free trial membership in the Hartford Auto Club

and a free trial of a phone card. The caller "told me that if I wanted to keep the membership or phone card [after the free trial] it would be charged to my account. ... I agreed to the free trials. At no time did anyone mention that any payment would be debited from my bank account. In fact, it was not my checking account, and I'm not authorized to write checks on that account." (Id. at ¶5.) As she did not have a bank account, she thought that the account which would be charged would be her new credit card, which may have been logical on her part. However, for purposes of the present motion, that is irrelevant because the Defendants no longer offer the Capital Choice credit card. Ergo, there no longer exists any possibility that a future consumer can mistakenly assume that the membership fees for the Hartford Auto Club or the phone card program will be charged to the credit card.

Ms. Wagar received the written information which accompanied the Hartford Auto Club and the phone card program. She called the numbers provided and gave instructions that she wanted to cancel the membership and not be charged for it. The cancellation was effective and her friend's bank account was not debited for the Hartford Auto Club membership. It was, however, debited $39.00 for the phone card program.

The Court must consider whether this evidence by the Plaintiff tends to prove a routine policy of making unauthorized debits by the Defendants. It does not. At best for the Plaintiff, it shows that a consumer willingly agreed to participate in the two up-sale programs, but then decided to cancel one of them, the Hartford Auto Club, and was never debited for that program. That portion of the program worked precisely as the Defendants explained it did. Taking Ms. Wagar's declaration as to the phone card

23

program in its best light for the Plaintiff, she attempted to cancel but the debit was made anyway. When she complained, the Defendants promptly attempted to make a full refund but the Receiver dishonored the check. As Mr. Lugo testified, see discussion *infra.*, if mistakes are made the money is promptly refunded. This evidence further shows that the Defendants do not knowingly debit the account of third parties who are not the "consumer" who is enrolled in the program. Not realizing that Ms. Wagar was not an authorized signer on the account which was used to enroll her in the credit card program, when she requested a refund the Defendants wrote the refund check payable directly to her.

The final declaration filed by the Plaintiff which pertains to the business practices of the present Defendants, is the declaration of Ms. Hayes, Plaintiff's Ex. 81. Plaintiff's counsel singled out this one declaration in closing argument as proof of the Defendants' post consent decree practices and made the following representation,

> Mr. Williams: Your Honor, Defendants [sic] testimony show [sic] that the Defendants have and continue to debit consumers' bank accounts without their authorization. Consumers' declarations that have been admitted show the consumers' accounts were debited without authorization after the consent order in this matter. One consumer, Haze [sic] PX 81, had her check returned as a result of the consent order, but her account number was taken and her account was subsequently debited.

(Tr. October 16, 2002, p. 329.)

A reading of the declaration, however, does not show that Ms. Hayes was debited. If anything, Defendants' programs worked as intended as to Ms. Hayes. She declares that in March, 2002, she mailed her $39.00 check to Capital Choice to receive

the merchandise credit card.  On June 20, she received a letter from Capital Choice stating that the program had been discontinued pursuant to the Consent Order and her check, uncashed, was returned to her.  On June 24, she received the information from the Hartford Auto Club, clearly stating that she had given authorization for the free trial program by telephone on June 6, that the free trial membership would end on July 8, and that, thereafter, an annual fee of $99.00 would be debited from her bank account.  She called Hartford Auto Club's customer service number to cancel her membership; the service representative confirmed that her account was cancelled and gave her a cancellation number.  Her account was not debited.

A few days later, she received the written information for phone card program, again stating that she had given authorization to be enrolled in the free trial period on June 6, that the free trial period membership would end on July 9, and that, thereafter, a monthly fee would be debited from her bank account.  She called the customer service number to cancel her membership.  Her bank account was not debited for the phone card program.  There is little evidence at best before the Court that any consumer ever received the written information regarding the two up-sale programs who had not first, in a tape recorded conversation, agreed to the programs and agreed that if they did not cancel after the free trial membership, their bank account would be debited.

### B. Plaintiff's Reliance upon the Records of the Automated Clearing Houses

Automated clearing houses are companies which exist to perform the service of electronically processing charges for merchants.  One such company is ACH Direct,

which is used by the Defendants. The risk manager of that company, Mr. Kardos, was deposed by the F.T.C. in this case. His testimony was introduced into evidence, without objection, by the Plaintiff. (Pl.'s Ex. 1.)   Mr. Kardos undertook an examination of the number of Hartford Auto Club or phone card program debits which did not clear the consumer's bank. The records of ACH Direct showed that in a period from January 1, 2000 to August 13, 2002, the number of transactions which cleared the consumer's bank, was in excess of 25,000 and that the number of attempted debits which were rejected was in excess of 1,700, more than 1,000 of which were because the consumer's account had non-sufficient funds to pay the debit.

The Plaintiff offers the number of transactions which are entered in the ACH record as "unauthorized" as being proof that the consumer did not authorize the transaction. The testimony does not support this argument. The deposition testimony shows that there are many reasons why a person might claim a refund and tell his or her bank that they never authorized the transaction. Mr. Kardos testified, "I can probably come up with twenty-five more [reasons] that the electronic debit gets reversed" other than a bona fide lack of initial authorization.

The Plaintiff asks the Court to conclude, based upon the records of ACH Direct, that a large number of consumers did not initially authorize their accounts to be debited for the Hartford Auto Club or the phone card program.  This seems to be a dubious proposition when one compares the number of transactions to the number of rejections, and the reasons for the rejections.   As Mr. Kardos testified, 25,068 transactions were credited to the Defendants' account, i.e., they cleared the consumer's bank.  "Under the rejects [column] we have the breakdown of the items that were

returned to us or rejected. Non-sufficient funds were 1,044 returned, invalid accounts 252, account closed 45, authorization – due to authorization which means unauthorized transactions, 408 transactions." He explained that "invalid account means the bank was not able to process the transaction or to locate the account for the consumer." The reason for that "could be a processing error when they are processing transactions," which could arise because of a "wrong account number." (Kardos Depo. pgs. 27-28.)

Given the fact that the core product sales of the Defendants' credit card were directed to parties who had little credit or were trying to reestablish credit, given the fact that, as in the case of Ms. Mallion, she admitted that her bank account had several over-drafts unrelated to the Defendants' activities during the relevant time frame, the Court cannot conclude that just over 1,000 rejections for NSF tends to prove that the consumers did not initially authorize the debit. Nor do 252 invalid accounts, 45 closed accounts, nor 408 "unauthorized transactions," which can mean many things according to Mr. Kardos, prove that the consumer did not initially authorize the charge. The Court notes that the gross number of rejections (1,773 divided by 25, 068), including for all of the above and other reasons, is approximately 7% of the total number of more than 25,000 transactions which did clear the consumers' banks. This evidence falls short of proving that, as a routine business practice, the Defendants conduct unauthorized debiting.

Similarly, the Plaintiff relies upon the records of the Defendants' primary automated clearinghouse, Global E-Telecom (Ex. 1 to Pl.'s Ex. 2). The deposition testimony of Mr. Villarreal, the representative of Global E-Telecom, does not support

the Plaintiff's conclusion. The fact that 9.67% of the consumers may have told <u>their</u> <u>bank</u> that they had not authorized the debit is not proof that either they or someone else who had access to their account did not initially authorize the debit.

As the number of debits which did not clear processed by Global E-Telecom for NSF reasons are nearly 50% of the total, if one takes them out of the equation to get the more accurate view of the Defendants' clearance rates, the rate substantially increases to approximately 70%. Even in the remaining uncollected group are the substantial numbers of wrong account information given, closed accounts, providing accounts, such as savings accounts, which do not permit debiting and many other reasons which do not tend to prove the absence of an initial authorization. Mr. Villarreal, whose company handles electronic debiting on behalf of many other merchants than the Defendants, and whose testimony is offered by the Plaintiff as proof of its case, testified that the clearance rate regarding Millennium, Hartford and the phone card programs was not unusually low. Asked whether or not if it was in line with the clearance rate of other merchants, he answered, "Absolutely." (Villarreal Depo., pgs. 108-109.)

## CONCLUSIONS OF LAW

I.

### Injunction Standards

A preliminary injunction is an extraordinary and drastic remedy that will not be granted unless the movant "clearly establishes the burden of persuasion" as to each of the four prerequisites: Those four prerequisites are: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction

28

issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  McDonald's Corporation v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Horton v. City of St. Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001).

Additionally, "federal courts should not grant injunctive relief when the conduct sought to be stopped has ceased and is unlikely to resume." Snair v. City of Clearwater, 787 F.Supp. 1401, 1415 (M.D. Fla. 1992).  As the court explained in Brooks v. City of Tallahassee, 202 F.Supp. 56 (N.D. Fla. 1961):

> Since equity interposes by injunction to prevent future rather than past acts, acts and practices will not furnish a basis for injunctive relief when they have been discontinued or abandoned before institution of the suit brought to restrain them, or even after such suit is begun, particularly where there is nothing to indicate a probability that they will be resumed.

Id. at 58 (citations omitted).


## II
## The Plaintiff Failed to Establish That Defendants' Current Business Practices Violate the Telemarketing Sales Rule

As noted previously, since injunctive relief is inappropriate where past acts have been discontinued or abandoned, the Plaintiff should have presented evidence at the hearing that Defendants are currently violating the law.  However, the Plaintiff's evidence, for the most part, dealt with up-sales of the Hartford Auto club and phone card programs connected with the Defendants' abandoned catalog credit card program.

The Plaintiff knew that the credit card program was no longer in existence since the consent Order of April 23, 2002. Although it wasn't their burden, the Defendants presented the evidence of their current sales practices by placing the current sales scripts and program materials that have been in use since the Consent Order. The Court finds that the Plaintiff has failed to "clearly establish the burden of persuasion" that Defendants' current business practices as to Hartford Auto Club or the phone card programs violate the telemarketing sales rules at 16 C.F.R. §310.3 (a)(3). McDonald's Corporation v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

Section 310.3(a)(3) of Title 16 of the Code of Federal Regulations provides that prior to drawing on a person's checking, savings, or other similar accounts, a seller must have "express, verifiable authorization." Naturally, a "check draft or other form of negotiable paper" signed by the person will suffice. 16 C.F.R. §310.3 (a)(3)(i). In this electronic age, however, the F.T.C. recognizes that electronic transfers may take place with alternative authorizations. Under the rule, those alternative authorizations are:

> (ii) Express oral authorization which is tape recorded and made available upon request to the customer's bank and which evidences clearly both the customer's authorization of payment for the goods and services that are the subject of the sales offer and the customer's receipt of all of the following information:
>
> (A) The date of the draft(s);
>
> (B) The amount of the draft(s);
>
> (C) The payor's name:

(D) The number of draft payments (if more than one);

(E) A telephone number for customer inquiry that is answered during normal business hours; and

(F) The date of the customer's oral authorization; <u>or</u>

(iii) <u>Written confirmation</u> of the transaction, sent to the customer prior to submission for payment of the customer's check, draft, or other form of negotiable paper, that includes:

(A) All of the information contained in §§ 310.3(a)(3)(ii)(A)-(F); and

(B) The procedures by which the customer can obtain a refund from the seller or telemarketer in the event the confirmation is inaccurate;

16 C.F.R. 310.3(a)(3)(ii)-(iii).

The evidence at the hearing established that the Defendants are currently complying with the above provisions. (Defendants' Exhibits "A-F") The Plaintiff, whose burden it was to clearly prove otherwise, failed to carry that burden.

First, the Defendants' sales presentations, placed into evidence as Exhibits "A" and "F," clearly establish that consumers are told orally over the phone "which is tape-recorded" (1) that the cost of either the Hartford Auto Club or phone card will be drafted to their checking or savings account, as the case may be, including identifying the account number; (2) the amount of the draft; (3) that the draft will occur on the date their free trial of the program is over, and (4) that they may call the customer service number in their program materials to cancel. In addition, the presentation identifies the name of the consumer (payor) and date of the recording.

When consumers receive their product packages, they receive the alternative

FTC vs. Capital Choice, etc., et al.
Case No. 02-21050-CIV

"written confirmation" of their prior oral authorization.  Defendants' current sales practices comply with both alternative express authorizations required by 16 C.F.R. 310.3 (a)(3).  Therefore, injunctive relief is inappropriate.

Based upon the foregoing, it is hereby **ORDERED and ADJUDGED** that Plaintiff's Motion for Preliminary Injunction is **DENIED.**

**DONE AND ORDERED** in Chambers at Miami-Dade County, Florida this __29th__ day of January, 2003.

Stephen T. Brown
United States Magistrate Judge

**Copies furnished to:**
Honorable Ursula Ungaro-Benages
counsel on attached list

FTC vs. Capital Choice, etc., et al.
Case No. 02-21050-CIV

## SERVICE LIST

Brinley H. Williams, Esquire                    Attorney for Plaintiff
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, OH  44114
Telephone:  (216) 263-3455
Facsimile:  (216) 263-3426


Andrew Cove, Esquire                            Attorneys  for  Defendants  E-Credit
225 South 21 Avenue                             Solutions,  Inc.,  Scott  A.  Burley  and
Hollywood, FL  33020-5009                       Zentel Enterprises, Inc.
Telephone:  (954) 921-1121
Facsimile:   (954) 921-1621

Diane Katzen, Esquire                           Attorney for Defendant Johnnie Smith
Richman Greer Weil Brumbaugh
201 S. Biscayne Boulevard, 10th Floor
Miami, FL 33131
Telephone: (305) 373-4000
Facsimile: (305) 373-4099



R. Stuart Huff, Esquire                         Attorneys  for  Defendants  Capital
Mark L. Mallios, Esquire                        Choice  Consumer  Credit,  Inc.,
Law Offices of R. Stuart Huff                   Millennium  Communications  and
330 Alhambra Circle                             Fulfillment,  Inc.,  Ecommex  Crop.,
Coral Gables, FL  33134-5004                    Hartford  Auto  Club,  Inc.,Ricardo  E.
Telephone:  (305) 448-8000                      Martinez and Wilfredo
Facsimile:   (305) 448-8494                     Lugo

33